**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACE CAM, INC. and BUSINESSING LLC, each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>RUNWAY AI, INC.,<br><br>    Defendant. | Case No.: 1:26-cv-01362-LAK<br><br> ORAL ARGUMENT REQUESTED |

**DEFENDANT RUNWAY AI, INC.'S MOTION TO DISMISS PLAINTIFFS'**
**CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

FACTUAL ALLEGATIONS ..................................................................................................... 5

    A. The YouTube Video-Sharing Platform.................................................................... 5

    B. YouTube's Alleged Technological Protection Measures ...................................... 7

    C. Runway's Alleged Copying of Audiovisual Works ............................................. 8

ARGUMENT............................................................................................................................... 9

I.    Plaintiffs Cannot Allege The Existence Of Access Controls On The Publicly Accessible
    YouTube Platform. ....................................................................................................... 10

    A. Section 1201(a) Applies Only To Access Controls, Not Copy Controls.......................... 10

    B. Plaintiffs' Concession That Their Videos Are Publicly Accessible Forecloses A Claim
    Based On Access Controls............................................................................................. 16

        1.    Plaintiffs Plead That Their Videos Are Accessible.................................................... 16

        2.    Plaintiffs' Allegations About "Files" Are Irrelevant. ............................................... 20

II.  The Alleged TPMS Are, At Most, Copy Controls................................................................... 22

III. Plaintiffs Have Not Adequately Alleged Authority Over Any TPMs. .................................. 30

CONCLUSION.................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009)................................................................10

*Avaya, Inc. v. Telecom Labs, Inc.*,
    No. CV 06-2490, 2012 WL 13035096 (D.N.J. May 1, 2012) .................................19

*Bartz v. Anthropic PBC*,
    787 F. Supp. 3d 1007 (N.D. Cal. 2025) ...........................................................4, 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007)................................................................20

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004)........................................................................11

*Cordova v. Huneault*,
    817 F. Supp. 3d 819 (N.D. Cal. 2026) ...............................................................20

*Couponcabin LLC v. Savings.com, Inc.*,
    No. 2:14-CV-39, 2016 WL 3181826 (N.D. Ind. June 8, 2016)...............................18

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010)...............................................................................2

*Digital Drilling Data Sys., LLC v. Petrolink Servs., Inc.*,
    965 F.3d 365 (5th Cir. 2020) ...........................................................................18

*Dish Network LLC v. World Cable Inc.*,
    893 F. Supp. 2d 452 (E.D.N.Y. 2012) ...............................................................29

*Gomez-Perez v. Potter*,
    553 U.S. 474, 128 S. Ct. 1931 (2008).................................................................12

*Hattler v. Ashton*,
    No. LA CV16-04099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) .......................16, 18, 24

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ................................................................29

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .......................................................1, 3, 4, 13, 17

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*,
   307 F. Supp. 2d 521 (S.D.N.Y. 2004)..................................................................................25, 29

*Kadrey v. Meta Platforms, Inc.*,
   788 F. Supp. 3d 1026 (N.D. Cal. 2025) ..............................................................................30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   387 F.3d 522 (6th Cir. 2004) ....................................................3, 12, 17, 18, 19, 24

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
   83 F. Supp. 3d 501 (S.D.N.Y. 2015)...................................................................................14

*Matthew Bender & Co. v. W. Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998)................................................................................................21

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ..............................................3, 13, 14, 18, 19, 26, 28

*ML Genius Holdings LLC v. Google LLC*,
   No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022)......................................................4

*Neitzke v. Williams*,
   490 U.S. 319, 109 S. Ct. 1827 (1989)..................................................................................9

*Sony Music Ent. v. Uncharted Labs, Inc.*,
   No. 24 CIV 4777, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026)..........................................20

*Stanley v. City of Sanford, Fla.*,
   606 U.S. 46, 145 S. Ct. 2058 (2025).............................................................................14, 21

*Star Athletica, LLC v. Varsity Brands, Inc.*,
   580 U.S. 405, 137 S. Ct. 1002 (2017)................................................................................13

*Ticketmaster LLC v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) .............................................................................28

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471, 143 S. Ct. 1206 (2023)..............................................................................2, 5

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001)...............................................2, 12, 15, 17, 19, 24, 31

*Universal City Studios, Inc. v. Reimerdes*,
   111 F. Supp. 2d 294 (S.D.N.Y. 2000)...........................................2, 11, 14, 16, 27

*Van Buren v. United States*,
   593 U.S. 374, 141 S. Ct. 1648 (2021)......................................................................3, 11, 12

*Yout, LLC v. Recording Industry Ass'n of America, Inc.*,
    633 F. Supp. 3d 650 (D. Conn. 2022) ................................................................19, 20

**Statutes**

17 U.S.C. § 101 .................................................................................................................21

17 U.S.C. § 102(b) ...........................................................................................................16

17 U.S.C. § 106 .................................................................................................................13

17 U.S.C. § 107 .................................................................................................................16

17 U.S.C. § 109 ...........................................................................................................16, 21

17 U.S.C. § 202 .................................................................................................................21

17 U.S.C. § 411(a) ............................................................................................................30

17 U.S.C. § 501 ..............................................................................................................4, 13

17 U.S.C. § 1201 ....................................................................................................... *passim*

17 U.S.C. § 1201(a) .................................................................................................. *passim*

17 U.S.C. § 1201(b) ..........................................................................................13, 14, 15, 24

17 U.S.C. § 1201(c)(1) ......................................................................................................4, 15

17 U.S.C. § 1203(c)(3)(A) .................................................................................................15

18 U.S.C. § 1030(a) ...........................................................................................................12

Fed. R. Civ. P. 12(b)(6) ..............................................................................................2, 5, 9

**Other Authorities**

H.R. Rep. No. 94-1476 (1976) ..........................................................................................21

H.R. Rep. No. 105-551, pt. 1 (1998) .........................................................11, 14, 15, 16, 30, 31

H.R. Rep. No. 105-551, pt. 2 (1998) ...................................................................15, 16, 30

S. Rep. No. 105-190 (1998) .............................................................................14, 15, 16, 24

Jazz Tangcay, Hollywood 2.0: How The Rise of AI Tools Like Runway Are
    Changing Filmmaking, *Variety* (Feb. 22, 2023), https://tinyurl.com/5n79uz8r .......................3

Runway, How "House of David" Used Runway to Become Amazon's Latest Hit Series, https://tinyurl.com/bdcke4uw ................................................................................ 3

Runway, Runway Advances Video Generation and World Models With NVIDIA Rubin Platform (Jan. 5, 2026), https://runwayml.com/news/runway-partners-with-nvidia ................................................................................................................ 3

U.S. Copyright Office, Section 1201 of Title 17 (2017) ......................................................... 13, 14

Defendant Runway AI, Inc. respectfully submits this memorandum of law in support of its Motion to Dismiss the Consolidated Class Action Complaint filed on April 27, 2026 (ECF No. 33) (the "Complaint") by Plaintiffs Ace Cam, Inc. and Businessing LLC.

## **INTRODUCTION**

Plaintiffs produce video content that they upload to YouTube, the world's largest public video-sharing website. Ex. A, Consolidated Class Action Complaint, ECF No. 33 (hereinafter, "Compl.") ¶¶ 19, 21. Their sole claim takes aim at Runway for accessing that publicly accessible content. According to Plaintiffs, Runway violated the anti-circumvention provision of 17 U.S.C. § 1201(a)(1) of the Digital Millennium Copyright Act (DMCA), a digital "breaking and entering" statute designed to prevent unauthorized access to digital works, by downloading their videos from YouTube. Section 1201(a), however, has no application where works—in this case, Plaintiffs' videos—are publicly accessible to anyone with an internet connection. While it forbids breaking controls in order to gain *access* to a work, it does not bar making *copies* of an already-accessible work—particularly one that is accessible to the public without restriction. Congress made this distinction in the text of the statute. 17 U.S.C. § 1201(a)(1), (a)(2), (b). And it left regulation and circumvention of *copy* controls to the traditional provisions of the Copyright Act, not the DMCA. The sole claim of the Complaint is thus not viable as a matter of law.

YouTube is, by design, an open and accessible website. No passwords, paywalls, or authentication requirements stand between the public and YouTube video streams. Any member of the "public" with an internet connection "can watch and listen to videos for free." Compl. ¶¶ 2, 29. They need only navigate to the website via a web browser and choose a video; there is no more to it. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1199 (9th Cir. 2022) ("[A] defining feature of public websites is that their publicly available sections lack limitations on

access; instead, those sections are open to anyone with a web browser."). Widespread public accessibility is the foundation of the YouTube platform. Content creators choose to upload their content to YouTube because it offers the best possibility of high "viewership," and therefore advertising revenue, sponsorship, and other "monetization" opportunities that flow from easy selection and viewing of relevant content by consumers. Compl. ¶¶ 19, 21. YouTube, meanwhile, protects its right to "monetize" that content by requiring every uploader to grant a blanket right "to access your Content through the Service." Shaffer Decl. in Support of Request for Judicial Notice, Ex. 1, YouTube Terms of Service (hereinafter, "TOS") at 9; *see* Compl. ¶ 61 n.1 (incorporating TOS by reference).[1] It would be trivial from a technical perspective to put the entire platform behind a password barrier, similar to how other online video services like HBO Max or Netflix require users to login. But the YouTube model is different. Open "access" is the whole point.

The inherently public nature of YouTube's video platform disposes of Plaintiffs' sole claim. Section 1201(a)(1) governs "'the act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work,' an act described by Congress as 'the electronic equivalent of breaking into a locked room in order to obtain a copy of a book.'" *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 316 (S.D.N.Y. 2000) (citation omitted), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001). YouTube—which offers unfettered access to over a billion users a month—is no "locked room." *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 479-80, 143 S. Ct. 1206, 1215-16 (2023).

---

[1] Because the Terms of Service are "incorporated by reference" into Plaintiffs' Complaint and "render[ed] … 'integral' to the complaint" through Plaintiffs' citations, the court may consider them in assessing the motion to dismiss under Rule 12(b)(6). *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Runway's Request for Judicial Notice (filed concurrently herewith).

"With regard to websites made freely accessible on the Internet, the 'breaking and entering' analogue … has no application." *hiQ*, 31 F.4th at 1198. That much is clear from the text, context, and purpose of § 1201, which leave no doubt that an "effective access control" is one which prevents access to the work altogether. In the Supreme Court's words, "access" is "a gates-up-or-down inquiry—one either can or cannot access" a work. *Van Buren v. United States*, 593 U.S. 374, 390, 141 S. Ct. 1648, 1658 (2021). Two appellate courts have already confirmed that § 1201 means what it says. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 953 (9th Cir. 2010) (no access control where there is any "ability to access" the work); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004) (§ 1201(a) "does not naturally extend to a technological measure that restricts one form of access but leaves another route wide open"). This Court should do the same.

As an anti-piracy statute, the DMCA has little to do with Plaintiffs' real concern, which is Runway's use of publicly available videos to create new and transformative technology unlike anything that existed before. Runway builds artificial intelligence (AI) systems for creating, editing, and simulating all kinds of visual worlds. Creators use Runway to make and edit videos, from personal projects to Oscar-winning films, while researchers and technology companies can leverage its world models to accelerate discovery in robotics, life sciences, and beyond.[2] According to Plaintiffs, Runway "downloaded" their videos from YouTube, "copying" their "copyrighted videos." *See, e.g.*, Compl. ¶¶ 1, 78, 81, 87, 109. They call this "infringement." *E.g.*,

---

[2] *See* Jazz Tangcay, Hollywood 2.0: How The Rise of AI Tools Like Runway Are Changing Filmmaking, *Variety* (Feb. 22, 2023), https://tinyurl.com/5n79uz8r (discussing use of Runway's tools in Oscar Best Picture winner *Everything Everywhere All At Once*); Runway, How "House of David" Used Runway to Become Amazon's Latest Hit Series, https://tinyurl.com/bdcke4uw; Runway, Runway Advances Video Generation and World Models With NVIDIA Rubin Platform (Jan. 5, 2026), https://runwayml.com/news/runway-partners-with-nvidia.

*id.* ¶¶ 16, 118, 152. But the Copyright Act, not the DMCA, provides a cause of action for infringement. 17 U.S.C. § 501. Plaintiffs have not brought a copyright claim—perhaps because other plaintiffs who have accused generative AI technologies of infringement have run headlong into the fair-use doctrine, which protects creators' rights to make use of copyrighted material to build transformative technologies. *See, e.g.*, *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025).

Whatever the reason, Plaintiffs' inability to establish the infringement claim they'd like to bring is no reason to disfigure copyright law. Congress took great pains to ensure the DMCA's protection of *access controls* would not be used, as Plaintiffs would have it, as a get-out-of-fair-use-free card. *See* 17 U.S.C. § 1201(c)(1). Nor did Congress design the DMCA's access control provision to empower any user of YouTube, or any other global platform, to leverage private contractual terms of service with the force of federal law. *Cf. hiQ*, 31 F.4th at 1201; *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *1, *4 (2d Cir. Mar. 10, 2022) (claim for breach of Terms of Service preempted by Copyright Act). Particularly not when those contractual terms protect the right of a single incumbent: The Terms of Service reserve the right for YouTube and all affiliates—including Google LLC, which operates YouTube—to do anything they want with user-uploaded videos, AI training included. TOS at 8-9. As Plaintiffs would have it, YouTube's collection of billions of videos would continue to be used to train AI, but only by Google.[3]

Ultimately, Plaintiffs cannot plead their way out of the statutory defect at the core of their claim. The text of § 1201 bars their claim: To plead an access control, as Congress defined it in

---

[3] Not one of the copycat DMCA class actions similar to Plaintiffs' proliferating around the country against the likes of Snap, Nvidia, Amazon, OpenAI, ByteDance, and Apple has been brought against Google.

the DMCA, Plaintiffs would have had to allege that their videos are locked away from the public, and that Plaintiffs hold the key. Having posted their works to the largest publicly accessible video website in the world, they cannot do so. YouTube is open to anyone in the world with a common internet browser, and none of Plaintiffs' technical allegations about what happens under YouTube's hood change that undisputed, dispositive fact. *Infra* § I. Plaintiffs' allegations about YouTube's purported "technological measures" independently fail because they describe *copy* controls that restrict the ability to download copies, rather than the requisite *access* controls; many also simply fail to meet the statutory definition of a technological measure. *Infra* § II. And because those measures belong to YouTube, not Plaintiffs, they fall outside the scope of § 1201 anyway. *Infra* § III. The Court should therefore dismiss the Complaint in full and without further leave to amend.

## FACTUAL ALLEGATIONS[4]

### A.    The YouTube Video-Sharing Platform

YouTube is an online video-sharing website provided by Google LLC. TOS at 3. YouTube, which is not a party to this case, is one of "the largest and most ubiquitous platforms on the internet," with "over 1 billion" active users each month. *Twitter*, 598 U.S. at 479-80, 143 S. Ct. at 1215-16; *see also* Compl. ¶¶ 17-22. YouTube users can both upload videos that they wish to share and view videos others have shared. Compl. ¶¶ 2, 8-9, 29. Once a video is uploaded to YouTube, users "can watch and listen to videos for free." *Id.* ¶ 29.

Public access to shared videos is the point of the YouTube platform. Users like Plaintiffs upload videos to YouTube so that they are accessible to the world. Plaintiffs "derive[] value via viewership, advertising, sponsorships, licensing, and related monetization" on the YouTube

---

[4] As required by Rule 12, Runway assumes the factual allegations in the Complaint to be true, for purposes of this motion only.

platform. Compl. ¶¶ 19, 21. Users who upload videos, like Plaintiffs, seek to "drive organic channel growth, subscriber acquisition, and expanded audience reach" on the platform. *Id*. ¶ 115. In other words, users like Plaintiffs want as many members of the public to freely access their videos as possible.

To effectuate public access, users that upload videos—"Content" as it is called in the YouTube TOS—grant broad and nonexclusive copyright licenses to both Google and other YouTube users. The TOS define "YouTube" to mean Google LLC, so every reference to "YouTube" is actually a reference to Google. TOS at 3. As to Google, the grant is for a "worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it)" both "in connection with the [YouTube] Service" *and* Google's "(and its successors' and Affiliates') business." *Id.* at 8-9. "Affiliates" is broadly defined to be "the other companies within the Alphabet Inc. corporate group." *Id.* at 3. There is no license limitation or other covenant in the TOS that prevents Google or its affiliates from training artificial intelligence products on user-uploaded videos. *See generally id*. Every user that uploads a video to YouTube thus consents to Google and its affiliates training AI products on its videos. Other YouTube users, coextensive with the internet-using public at large, receive a license to "access [the uploaded videos] through the Service." *Id.* at 9.

YouTube videos are accessible to the public through the internet, and no login, password, or authentication is required to access videos. Compl. ¶ 29. A user can access a video through YouTube's website via an ordinary internet browser. When a user does so, the website loads a video player that displays the relevant video. The video files are played by the YouTube video player through a "streaming architecture that transmits segmented, time-limited portions" of the

underlying digital video files. *Id*. ¶ 32. The segmented files are delivered to the player, and reconstructed into a "continuous audiovisual experience" that reflects the contents of the relevant user-uploaded video file. *Id.* ¶ 38. YouTube also offers users the ability to download entire copies of video files on its platform for offline streaming through a "Premium" Plan. *Id*. ¶ 67. Plaintiffs do not allege that they or any other user who uploads video content has any control over whether their videos can be downloaded through the Premium Plan. *Id.*

**B.      YouTube's Alleged Technological Protection Measures**

According to the Complaint, YouTube "prevents users from downloading copies" of audiovisual works uploaded by YouTube users. Compl. ¶ 29. Specifically, Plaintiffs allege that YouTube uses "technological processes and tools to detect and block access to files for unauthorized downloading." *Id*. ¶ 30. The Complaint identifies five such technological protection measures ("TPMs"), including: (1) a rolling cipher that makes it more difficult for a user to download a video file; (2) IP-address blocking and rate limiting that is selectively applied if abnormal traffic from the originating IP address is detected; (3) short-lived links to underlying video files; (4) CAPTCHA challenges, which are human solvable puzzles that are selectively deployed if unusual activity is detected; and (5) proof-of-origin tokens that validate that the video file is being requested by the YouTube online player. *Id*. ¶¶ 44-59. The TPMs identified in the Complaint are *not* alleged, either singly or in combination, to prevent the public at large from accessing the underlying audiovisual work via the YouTube website. Rather, it is apparent from the allegations of the Complaint that the TPMs are designed to prevent *downloading* underlying digital video files (*id.* ¶ 29), and do not restrict users from *accessing* the audiovisual works. *See id.* ¶¶ 44-59.

Although Plaintiffs allege that "[i]n uploading content to YouTube, content creators are authorizing and instructing YouTube to provide protection to the video content through

YouTube's anti-circumvention software," Compl. ¶ 9, the YouTube TOS tell a starkly different story. Nowhere do the TOS promise that specific TPMs or any TPMs at all will be provided by YouTube. To the contrary, Google provides its YouTube service "as is" and does "not make any specific commitments or warranties about the service." TOS at 12 (sentence case applied). Google disclaims liability for any "unauthorized access to or use of the service." *Id.* at 13. Google also reserves the right to change the TOS at any time. *Id* at 14. If a user doesn't like a change, its only recourse is to remove its content. *Id.* at 9-10, 14-15. By uploading and leaving content up, on the other hand, users write Google (and all of its affiliates) a blank check to use their videos for any purpose "in connection with … [its] business," including to produce and train AI models. *Id.* at 8-9.

### C.    Runway's Alleged Copying of Audiovisual Works

Runway is a pioneer in AI visual generation models, from video generation models to general world models and beyond. As Plaintiffs acknowledge, Runway's models are "a major technological advancement in AI video generation." Compl. ¶ 72. Its models empower creators and artists to craft everything from narrative films, to conversations with real-time interactive avatars, to architectural and design visualizations through text and image prompts; with a phrase or photo as instruction, an individual can create, edit, and refine any audiovisual clips they can imagine. *See id*. ¶ 71.

To develop an AI model, engineers must input data that the model's algorithms learn from in order to make predictions; this process is called "training." *See* Compl. ¶¶ 15, 69. Training requires inputting "significant amounts of data." *Id*. ¶ 69. The more data that is input, the better the algorithm's predictive capacities will be. For instance, the more examples the model has of a human hand waving, the better the model can provide a high-quality video clip to a user in response to the prompt, "have the two friends wave to each other." *See id*. ¶ 73. To train

the video-generation models at issue here, Runway used "curated, internal datasets" of audiovisual content. *Id*. ¶ 74.

Plaintiffs also allege that Runway obtained copies of audiovisual files from YouTube by "stream ripping," which they define as "converting streaming content into permanent, locally stored files." Compl. ¶ 83. To do so, Plaintiffs allege that audio and video files are downloaded "directly from a website's servers rather than viewing the content through the provider's authorized playback environment." *Id*. ¶ 92. In other words, the exact same files readily accessible for viewing by anyone with an internet browser, including Runway, via the YouTube website were copied and saved locally by Runway. *Id*.; *see also id.* ¶ 94 ("Defendant improperly accessed the underlying audio and video files and downloaded those files into Defendant's own system."). Plaintiffs do not allege Runway did or would have done anything wrong insofar as it accessed the video files for viewing on YouTube. Rather, it was only impermissible, per Plaintiffs, for Runway to *make copies of those video files* that it already had access to.

## ARGUMENT

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S. Ct. 1827, 1832 (1989). Here, that is the statutory meaning of "access controls" in 17 U.S.C. § 1201(a). Section 1201 carefully distinguishes between *access* controls, on one hand, and *copy controls*, on the other: The former protect a work locked behind a digital wall, the latter protect a work against infringement. The works here are YouTube videos, and Plaintiffs concede that they are on public display for anyone to see; there is no digital wall in sight. What Plaintiffs allege is not circumvention of an access control but rather an unauthorized reproduction of a copy—straightforward copyright infringement—which is outside the scope of the DMCA and thus fails to state a claim as a matter

of law. *Infra* § I.

Though the Court need go no further than applying the statutory text to dismiss the case, the Complaint also fails for the independent reason that it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" for circumvention of an effective access control. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citation omitted). Not one of Plaintiffs' five purported technological protection measures undermines the basic fact that YouTube is publicly accessible. Plaintiffs' allegations about YouTube's operations at the technical level ultimately fall short of the *statutory* requirements several times over: they variously fail to allege that the works are walled off behind a digital lock, that there is any lock that can be opened in the first place, or that Runway even picked a purported digital lock. *Infra* § II. Finally, Plaintiffs' claim fails for an additional, related reason: Any access control must be the *copyright holder*'s under the plain terms of § 1201(a). But there is no denying that the measures at issue here are all YouTube's—they are not Plaintiffs' to enforce, no less with the force of federal law. *Infra* § III.

I.      **Plaintiffs Cannot Allege The Existence Of Access Controls On The Publicly Accessible YouTube Platform.**

There is a sleight-of-hand at the heart of the Complaint in this case: Do Plaintiffs allege violation of "access" controls under the DMCA, or is their complaint really about copying? Statutory text, context, and purpose leave no question that a technological measure "effectively controls access to a work" where it renders the underlying work entirely inaccessible. § I.A. Yet Plaintiffs concede YouTube videos are freely available to the public, such that the Complaint on its face defeats the statutory basis for their claim. § I.B.

A.      **Section 1201(a) Applies Only To Access Controls, Not Copy Controls.**

When Congress enacted § 1201 of the DMCA, "a critical focus of Congressional

- 10 -

consideration … was the conflict between those who opposed anti-circumvention measures as inappropriate extensions of copyright and impediments to fair use and those who supported them as essential." *Reimerdes*, 111 F. Supp. 2d at 316. Balancing the public's interest in access and fair use against the private interests of copyright owners, Congress enacted three statutory prohibitions on "[c]ircumvention of copyright protection systems," 17 U.S.C. § 1201:

> **[1]** (a)(1)(A) No person shall *circumvent* a *technological measure* that effectively *controls access to a work* protected under this title.
>
> …
>
> **[2]** (a)(2) No person shall manufacture, import, offer to the public, provide, or otherwise *traffic* in any *technology*, product, service, device, component, or part thereof, that—
>
>> (A) is primarily designed or produced for the purpose of *circumventing a technological measure* that effectively *controls access to a work* protected under this title;
>
> …
>
> **[3]** (b)(1) No person shall manufacture, import, offer to the public, provide, or otherwise *traffic* in any *technology*, product, service, device, component, or part thereof, that—
>
>> (A) is primarily designed or produced for the purpose of *circumventing protection afforded by a technological measure* that effectively *protects a right of a copyright owner under this title* in a work or a portion thereof ….

17 U.S.C. § 1201 (emphases and enumeration added); *see* H.R. Rep. No. 105-551, pt. 1, at 26 (1998); *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed. Cir. 2004). The first provision is at the center of this case.

The plain language of § 1201(a)(1) makes clear that an "access" control is a technological measure that prevents *access* to a work. *See, e.g.*, *Van Buren*, 593 U.S. at 381, 141 S. Ct. at 1654 (statutory construction begins with the text). The text contemplates "controls" on "access" and requires "the authority of the copyright owner[] to *gain access* to the work" in the first place. 17

U.S.C. § 1201(a)(3)(B) (emphasis added). Where a work is publicly accessible, no "authority of the copyright owner" is required to "gain access." Thus courts have relied on the plain text of the statute in recognizing § 1201(a) "does not naturally apply when the 'work protected under this title' is otherwise accessible"—that is, "to a technological measure that restricts one form of access but leaves another route wide open." *Lexmark*, 387 F.3d at 547. Section 1201(a) thus contemplates that "access" is binary: A technological measure either prevents others from gaining access to the work altogether or it does not control access at all. That is true of every example Congress provided of an access control in § 1201: A "scrambled work" and an "encrypted work" are both fully unintelligible until descrambled or unencrypted—that is, inaccessible. 17 U.S.C. § 1201(a)(3)(A); *see Corley*, 273 F.3d at 435 (recognizing encryption codes and password protection as access controls).

In short, "access" is all-or-none—or, as the Supreme Court put it in a related context, a "gates-up-or-down inquiry." *Van Buren*, 593 U.S. at 390, 141 S. Ct. at 1658. In *Van Buren*, the Court interpreted similar statutory text in the Computer Fraud and Abuse Act (CFAA), which provides "[w]hoever … intentionally *accesses* a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer" shall be punished. 18 U.S.C. § 1030(a)(2)(C) (emphasis added); *see, e.g.*, *Gomez-Perez v. Potter*, 553 U.S. 474, 479, 128 S. Ct. 1931, 1936 (2008) (statutory interpretation "guided by our prior decisions interpreting similar language in other [related] statutes"). The Court explained that "one either can or cannot access a computer system," *Van Buren*, 593 U.S. at 390, 141 S. Ct. at 1658; there is no middle path. Following on *Van Buren*, circuits have recognized that Congress's word choice of "access" enacts "a baseline in which access is not generally available," so "[w]here the default is free access without authorization," "selective denial of access" does not

meet the statutory test. *hiQ*, 31 F.4th at 1195-96 (interpreting CFAA). The same is true of § 1201(a). The diction of the access control provision assumes that a work is completely unavailable, and the provision has no purchase where works are made freely available to the public at large.

Were there any doubt that access under § 1201(a) is all-or-none, the immediate statutory context resolves it. *See, e.g.*, *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414, 137 S. Ct. 1002, 1010 (2017) ("Interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." (citation omitted)); *see MDY*, 629 F.3d at 943 (reasoning the three provisions of § 1201 must be read "side-by-side"). Across the provisions of § 1201 (and the Copyright Act), Congress created a matrix of protections:

|  | **Circumvention Prohibition** | **Trafficking Prohibition** |
| --- | --- | --- |
| **Access Controls** | § 1201(a)(1)<br>"controls access to a work" | § 1201(a)(2)<br>"technology" that "controls access to a work" |
| **Copy Controls** | §§ 106, 501<br>"infringement of copyright"<br>(*not* covered in § 1201) | § 1201(b)<br>"technology" that "protects a right of a copyright owner under this title in a work" |

*See* U.S. Copyright Office, Section 1201 of Title 17 at 7 (2017) (presenting similar chart). Each of § 1201's three statutory prohibitions play a specific role in the statutory scheme. Relying on the Second Circuit's decision in *Corley*, the Ninth Circuit explained that "§ 1201 is best understood to create two distinct types of claims": those concerning *access controls* (top row above) and those concerning *copy controls* (bottom row). *MDY*, 629 F.3d at 944; *see* U.S. Copyright Office, Section 1201 of Title 17 at 7 (adopting same distinction). Access controls under § 1201(a) protect "access" to a work, "and in contrast," copy controls under § 1201(b) are

"aimed at circumventions of measures that protect the copyright itself" from "reproduction, distribution," and other infringements. *MDY*, 629 F.3d at 944. Access controls and copy controls, like § 1201(a) and (b) in which they are respectively housed, "are not interchangeable." S. Rep. No. 105-190, at 12 (1998); *see generally Stanley v. City of Sanford, Fla.*, 606 U.S. 46, 53, 145 S. Ct. 2058, 2064 (2025) ("That Congress used different language in … two provisions strongly suggests that it meant for them to work differently.").

In that scheme, access control claims under § 1201(a)(1) concern the initial exposure to a copyrighted work. Circumventing access controls is the "electronic equivalent of breaking into a locked room in order to obtain a copy of a book." *Reimerdes*, 111 F. Supp. 2d at 316 (quoting H.R. Rep. No. 105-551, pt. 1, at 17). Courts in this circuit have accordingly recognized such claims where, for instance, a defendant has broken through password protection blocking access to a work. *See LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 510 (S.D.N.Y. 2015) (collecting examples).

But "[p]aragraph (a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work…, even if such actions involve circumvention of additional forms of technological protection measures." H.R. Rep. No. 105-551, pt. 1, at 18. Those subsequent circumventions instead violate copy controls, for which only trafficking is restricted under § 1201(b), and by the law of infringement subject to all applicable defenses. There is no § 1201(a) claim.

Preserving the distinction between the domain of access controls and copy controls thus "ensures that neither section [1201(a) or (b)] is rendered superfluous." *MDY*, 629 F.3d at 946. Section 1201(a) prohibits circumventing access controls and trafficking in such circumvention tools. Section 1201(b) prohibits trafficking tools designed to evade copy controls (but lacks an

anti-circumvention provision). If § 1201(a)'s access-control provision also encompassed copying of accessible content, trafficking in copying tools would violate § 1201(a)(2) and leave no independent work for § 1201(b). As the Second Circuit explained in contrasting the two anti-trafficking provisions, "the focus of subsection 1201(a)(2) is circumvention of technologies designed to *prevent access* to a work, and the focus of subsection 1201(b)(1) is circumvention of technologies designed to *permit access* to a work but *prevent copying* of the work." *Corley*, 273 F.3d at 441 (citing S. Rep. No. 105-190, at 11-12).[5]

Equally important is what's missing from § 1201. As the chart above highlights, while Congress prohibited *trafficking* in technology designed to circumvent both *access* controls and *copy* controls, it only prohibited the *circumvention* of *access* controls. The statute imposes *no prohibition on the circumvention of copy controls*. That is because "*copyright* law has long forbidden copyright infringements"—the result of circumventing a copy control—"so no new prohibition was necessary." S. Rep. No. 105-190, at 12 (emphasis added). Copyright infringement (or in DMCA parlance, circumventing copy controls) also remains subject to the fair-use defense, which Congress carefully preserved. *See* 17 U.S.C. § 1201(c)(1) ("Nothing in this section shall affect … defenses to copyright infringement, including fair use."); *see also, e.g.*, H.R. Rep. No. 105-551, pt. 1, at 20; H.R. Rep. No. 105-551, pt. 2, at 26, 35 (1998). As this Court has explained, Congress "struck a balance" in § 1201 through "the careful limitation of Section 1201(a)(1)'s prohibition of the act of circumvention to the act itself" to ensure "'the

---

[5] Congress's distinction between access controls and copy controls also makes sense in light of the DMCA's damages regime, under which statutory damages are available "for each violation of section 1201." 17 U.S.C. § 1203(c)(3)(A). If the same act of post-access copying could qualify as both a violation of access controls and copy controls, it would permit double recovery for violations of the anti-trafficking provisions in § 1201(a)(2) and (b)(1), despite Congress's efforts to keep each category discrete.

traditional defenses to copyright infringement, including fair use, … [would be] fully applicable' provided 'the access is authorized.'" *Reimerdes*, 111 F. Supp. 2d at 322-23 (citing H.R. Rep. No. 105-551, pt. 1, at 18); *see* H.R. Rep. No. 105-551, pt. 2, at 26 ("The Committee considers it particularly important to ensure that the concept of fair use remains firmly established in the law."); *see also id.* at 19-20, 35, 39; S. Rep. No. 105-190, at 12.

In short, § 1201(a)(1) covers only technological measures that control "access"—*not* "copying," or any other form of infringement, after access is available in at least one form. *See Hattler v. Ashton*, No. LA CV16-04099, 2017 WL 11634742, at *5, *8 (C.D. Cal. Apr. 20, 2017) (section 1201(a)(1) "should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying"). Were it otherwise, § 1201(a)(1) would become an infringement claim under another name—and, worse, an infringement claim without the significant limitations of §§ 102(b) (copyright does not extend to ideas, facts, or methods), 109 (first sale of a copy exhausts copyright), or 107 (fair use).

## B.     Plaintiffs' Concession That Their Videos Are Publicly Accessible Forecloses A Claim Based On Access Controls.

To plead a DMCA claim for circumvention of access controls, Plaintiffs had to allege that the videos they make publicly available on YouTube are not accessible to the public. They have not, and cannot, do so; to the contrary, they concede their *audiovisual works* are freely available. To end-run the statutory language, Plaintiffs focus on the "files" accessed via streaming versus downloading. That argument fails because § 1201(a) purposely used the word "work," not copy, because "work" is a broader and format-agnostic term.

### 1.     Plaintiffs Plead That Their Videos Are Accessible.

Plaintiffs do not even try to make the statutorily required showing that their authorization is necessary to gain access to their works on YouTube. There is not a single allegation that a user

of YouTube must, for instance, input a password or authenticate through a paywall. *See Corley*, 273 F.3d at 435. Not one hint that a user needs anything more than a stock internet browser and an internet connection to anonymously view whatever YouTube video they please. Plaintiffs in fact concede that "YouTube allows the public to view audiovisual works." Compl. ¶ 2. They upload the videos to be "publicly performed." *Id*. ¶ 8. And they admit, as they must, that anyone "can watch and listen to videos for free on YouTube's advertising-supported service." *Id.* ¶ 29. After all, YouTube requires Plaintiffs and any other users who upload content to "grant" every other user of the service a "license to *access your Content*." TOS at 9 (emphasis added). That open access is what draws "content creators" to "upload[] [their video content] onto YouTube's video sharing platform" to begin with: it enables them to get "viewership" that they "monetiz[e]" for their own ends. Compl. ¶¶ 19, 21, 27.

By the same turn, though, that publicity forecloses Plaintiffs' ability to plausibly allege that access to their videos is gated off, as they must to state a claim under § 1201(a)(1). As courts have recognized, "a defining feature of public websites is that their publicly available sections lack limitations on access." *hiQ*, 31 F.4th at 1199. And no circuit has recognized a § 1201(a) violation "where the access-control measure left the [work] freely readable"—or, here, viewable—even if there are some controls on making a copy from that access. *Lexmark*, 387 F.3d at 547. In *Lexmark*, the plaintiff printer company put in place technology meant to prevent use of unauthorized toner cartridges with its printers. While that measure "block[ed]" use of a printer and the copyrighted code inside it when an unauthorized cartridge was present, the Sixth Circuit rejected Lexmark's § 1201(a) claim because "[a]nyone who buys a Lexmark printer may read the literal code of [the program] directly from the printer memory" and thereby access the work without confronting the measure. *Id.* at 546-47. The fact that the purchaser of the printer

- 17 -

could examine the copyrighted code directly without circumventing anything was dispositive, notwithstanding the control measure that blocked the code from running if an unauthorized cartridge was present. *Id.* Agreeing with the Sixth Circuit, the Ninth Circuit concluded a purported access control, a program called "Warden," did not meet the conditions of § 1201(a) because "a player's purchase of the [World of Warcraft, or "WoW"] game client allows access to the [copyrighted work's] literal elements and individual non-literal elements. Warden blocks one form of access to these elements: the ability to access them while connected to a WoW server. However, analogously to the situation in *Lexmark*, Warden leaves open the ability to access these elements directly via the user's computer," thereby missing the statutory mark. *MDY*, 629 F.3d at 953. The Fifth Circuit also agrees. *See Digital Drilling Data Sys., LLC v. Petrolink Servs., Inc.*, 965 F.3d 365, 376-77 (5th Cir. 2020) (where "data was stored in an open database file," technological measures that "restricted certain unauthorized uses … did not effectively control … access to the" database, such that no claim under § 1201(a) could lie).

District courts across the country have likewise recognized that, by definition, public websites cannot have access controls in place. In *Hattler*, for instance, the court rejected a § 1201(a) claim where the defendant had allegedly downloaded works off of YouTube, reasoning that "the statutory structure, appellate precedent and legislative history of the DMCA all support" the "conclusion" that § 1201(a)(1) "should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Hattler*, 2017 WL 11634742 at *8; *see also, e.g.*, *Couponcabin LLC v. Savings.com, Inc.*, No. 2:14-CV-39, 2016 WL 3181826, at *6 (N.D. Ind. June 8, 2016) (no § 1201(a) violation where "website remains accessible" notwithstanding technological measures); *Avaya, Inc. v. Telecom Labs, Inc.*, No. CV 06-2490, 2012 WL 13035096, at *8 (D.N.J. May 1, 2012) (following *Lexmark* and *MDY* to reject

- 18 -

§ 1201(a)(1) claim based on partial access).

To be sure, a small handful of (non-binding) district court decisions have addressed YouTube's anti-scraping and -downloading measures under § 1201(a), but those cases do not help Plaintiffs. The court in *Yout, LLC v. Recording Industry Ass'n of America, Inc.* (where appeal is currently pending), for instance, did not confront the threshold question here: the meaning of "access" versus "copy" controls in § 1201's statutory scheme. 633 F. Supp. 3d 650 (D. Conn. 2022). There, a company offering software that enables users to automatically download videos from YouTube for personal use sought declaratory judgment that it did not violate either the anti-circumvention or trafficking prohibitions of § 1201(a)(1) and (2) on the theory that "YouTube has no technological measure to circumvent because … any layperson can access the files Yout's software downloads" manually. *Id.* at 655, 662. The question the parties put before the court, in other words, was whether the measures "effectively" or ineffectively control access. The statutory distinction between copy controls and access controls was not at issue.[6] *Yout*'s passing mention of access controls accordingly did not address—let alone reconcile its analysis with—the plain "gates-up-or-gates-down" meaning of "access," the statutory context, or Second Circuit precedent explaining that the "focus" of subsection (a) is "circumvention of technologies designed to *prevent access* to a work," *Corley*, 273 F.3d at 441. *See Yout*, 633 F. Supp. 3d at 664.

Notably, the only in-circuit decision to address this issue after *Yout* declined to follow, or

---

[6] Recognizing neither the parties nor the court pressed the underlying statutory question of what qualifies as an access control, and the centrality of that question to preserving congressional intent that the DMCA not override the fair use defense, parties submitted amicus briefs to the Second Circuit. *Yout LLC v. RIAA, Inc.*, No. 22-2760 (2d Cir.), ECF No. 113. The Second Circuit not only permitted those amicus briefs after argument, but issued an order permitting the parties to file further responsive briefing. ECF No. 124.

even engage, its reasoning. *Sony Music Ent. v. Uncharted Labs, Inc.*, No. 24 CIV 4777, 2026 WL 1019199, at *3 n.1 (S.D.N.Y. Apr. 15, 2026).[7] *Uncharted Labs* itself offers little ammunition for Plaintiffs; it only declined to resolve the "statutory question" at issue here, citing factual uncertainties. *Id.* at *3. But there are no factual uncertainties in this case. Regardless of whatever else they may plead, Plaintiffs cannot plead their way around the fundamentally accessible nature of the forum to which they've posted their works. Because the works are undisputedly available on demand for public performance, *see* Compl. ¶ 8, there is no limitation on access, and Plaintiffs cannot plead a circumvention claim under § 1201(a). And "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should … be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007) (citations omitted).

### 2.    Plaintiffs' Allegations About "Files" Are Irrelevant.

Recognizing they cannot plead that their video content is inaccessible on YouTube as required to state a claim, Plaintiffs offer a red herring: They swap out references to accessing their *video content* in favor of allegations about accessing the underlying "*file*." Plaintiffs allege, for instance, that while "YouTube allows the public to view audiovisual works" through "streaming," it deploys "multiple [technological protection measures]" to prevent "*download* of the full underlying audiovisual *file*." Compl. ¶¶ 2, 33, 36 (emphasis added); *see, e.g.*, *id*. ¶ 2 (alleging YouTube keeps "underlying video files locked away"); *id*. ¶ 6 (alleging "downloading [of] files"); *id*. ¶ 33 (emphasizing "file-level access"); *id*. ¶ 62 (alleging intent to "restrict access

---

[7] The out-of-circuit decision in *Cordova v. Huneault*, 817 F. Supp. 3d 819 (N.D. Cal. 2026), hinges on a misreading of the Ninth Circuit's binding decision in *MDY*, *supra* 17-18. *Cordova*, 817 F. Supp. 3d at 833-34. Otherwise, it largely follows *Yout* and fails for similar reasons. *Id.* at 834.

to the digital files underlying the videos"); *id*. ¶ 94 (alleging "Defendant … downloaded [data] files"); *id*. ¶ 125 (defining class by "downloading" "at the file level"); *see also, e.g.*, *id*. ¶¶ 13, 30, 40, 46, 51, 59, 64, 73, 80, 82, 91, 92, 112, 141 (describing "downloading" of "files" as circumvention of access control). Plaintiffs' summary assertion that "[t]his distinction is critical," *id*. ¶ 149, is wrong as a matter of law.

Section 1201(a)(1) explicitly concerns measures that "control[] access to a *work* protected under this title," 17 U.S.C. § 1201(a)(1)(A) (emphasis added), which Plaintiffs here allege to be its "audiovisual works," *e.g.*, Compl. ¶¶ 8, 38. Congress stipulated that "'[a]udiovisual works' are works that consist of a series of related images … together with accompanying sounds." 17 U.S.C. § 101. They are not, contrary to Plaintiffs' suggestion, files, or "machine-readable embodiment[s] of the work," Compl. ¶ 38. While a "copy" of an audiovisual work may be "fixed" in a digital file format, the copy is not the "work" itself. 17 U.S.C. §§ 101, 202 (distinguishing between copyrighted work and material embodiment); *see Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 702 (2d Cir. 1998) ("The Copyright Act establishes a 'fundamental distinction' between the original work of authorship and the material object in which that work is 'fixed.'"). Congress knew how to apply restrictions to a particular "copy" of a work when it wanted to. *See, e.g.*, 17 U.S.C. § 109; *Stanley*, 606 U.S. at 53, 145 S. Ct. at 2064; *see also* H.R. Rep. No. 94-1476, at 53 (1976) (emphasizing the statutory language "reflect[s] a fundamental distinction between the 'original work' … and the multitude of material objects in which it can be embodied"). But here, because Congress protected measures that control access "to a work" rather than to any particular form (or copy) in which a work is fixed, whether *files* can be downloaded is beside the point. Because Plaintiffs do not deny that the *images and sounds* that constitute their *works* are freely accessible on YouTube, they cannot state a claim

- 21 -

predicated on *works* being inaccessible, regardless of what happens at the file level.

Even if the file were a relevant unit of analysis, Plaintiffs still have not plausibly alleged the files are inaccessible. As a technical matter, Plaintiffs concede that a member of the public that watches a video via YouTube's authorized player is really receiving a series of "segmented media streams" that are reconstructed by YouTube's software "into a continuous audiovisual experience" that reflects an entire audiovisual work. Compl. ¶ 38. Those "segmented audio and video streams" are the same files allegedly accessed by Runway. *Id*. ¶ 81. In either case— whether free access by a YouTube user using ordinary means like a web browser or through Runway's alleged scraping—the *work* accessed is the same down to the exact digital files that embody it on YouTube's platform.

Given that users can freely access audiovisual works using a simple web browser, Plaintiffs' own allegations foreclose their ability to state a claim under § 1201(a).

## II.    The Alleged TPMS Are, At Most, Copy Controls.

Given that Plaintiffs' sole claim rests on an untenable statutory interpretation, *supra* § I, the Court need go no further: Not a single allegation across the paragraphs describing purported technological measures suggests Plaintiffs' works are anything but openly accessible to the public. The technical allegations cannot plead access controls where open access is already conceded.

Even were the Court to look under the technical hood—and it need not—the Complaint suffers from another fatal defect: Plaintiffs fail to plausibly allege that Runway circumvented a technological protection measure ("TPM") that qualifies as an access control under 17 U.S.C. § 1201(a)(1). Plaintiffs have now amended their Complaint to add allegations about five purported TPMs: (1) a rolling cipher, (2) IP-address blocking and access-rate limiting, (3) short-lived links to underlying video files, (4) CAPTCHA challenges, and (5) proof-of-origin tokens.

Compl. ¶¶ 44-59. They allege that Runway circumvented these TPMs by "scraping" or "stream ripping" content from YouTube—that is, downloading content. *Id*. ¶¶ 91-108. Each purported TPM falls short.

Several statutory defects reoccur across the alleged TPMs (which we address individually next). First, as detailed above, a TPM must concern *access* controls, as distinct from copy controls. But any limit on *downloading*, versus viewing by streaming, is no more than a *copy* control. The statutory language is clear, so courts have accordingly rejected attempts, just like Plaintiffs', to enforce anti-downloading *copy* controls under § 1201(a)(1)'s *access* control provision. *Supra* 14-16, 18. That disposes of alleged TPMs (1) through (4), which, as pleaded, are no more than copy controls on *downloading*. The purported TPMs also face several other problems. That TPMs (2), (3), and (4) are applied *selectively* highlights that they are copy controls because they are triggered by "abnormal" conduct that suggests a user is downloading. They do not block access—they block copying, and only under certain circumstances. On top of that, a TPM only "'effectively controls access to a work' if the measure … requires the application of information, or a process or a treatment … to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Congress imagined a scenario in which a copyright holder builds a digital wall around their work and gives out the key—think a password-protected website or paywalled portal. *Supra* 14. There must be, under the statute, both a wall and a way through. But TPMs (1), (2), (3), and (5) do not have any information, process, or treatment that would allow a user access through the alleged barrier. Finally, even if any of these TPMs effectively controlled access to a work, Plaintiffs would still have to allege that Runway "circumvented" the measure to gain unauthorized access. 17 U.S.C. § 1201(a)(1), (a)(3)(A). That further invalidates TPM (5). Plaintiffs are left without a single plausible TPM.

***(1) Rolling Cipher.*** By Plaintiffs' own admission, the first TPM they allege—the rolling cipher—is squarely directed at preventing the "*downloading*" of YouTube videos. *See* Compl. ¶ 45. Although Plaintiffs call the rolling cipher a "digital lock," *id.*, Plaintiffs do not allege that the rolling cipher prevents access, as users can readily *watch* the streaming video on YouTube. The mechanism only inhibits "downloading, copying or distribution"—i.e., infringement—"of the audiovisual content." *Id.*

That is a copy control, not an access control. As the Sixth Circuit put it, a measure which "allow[s] some forms of 'access' but restrict[s] other uses of the copyrighted work, … such as *streaming media*, which permits users to view or watch a copyrighted work but *prevents them from downloading* a permanent copy of the work"—exactly what Plaintiffs allege here—is a *copy control*, not an access control under § 1201(a)(1). *Lexmark*, 387 F.3d at 545 (emphasis added) (citing, inter alia, *Corley*, 273 F.3d at 441); *see Hattler*, 2017 WL 11634742, at *8; *see also* S. Rep. No. 105-190, at 12 ("[I]f an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied, then a potential cause of action … lies under subsection 1201(b), but not under subsection [1201(a)]."). Plaintiffs therefore have not stated a claim under § 1201(a) by alleging that Runway circumvented YouTube's "rolling cipher."

But that is not all. An access control requires that a user apply "information, or a process or a treatment" to the measure to "gain access to the work." 17 U.S.C. § 1201(a)(3)(B). In other words, the owner sets up a digital wall around their work, and hands out the key to a few people. A password on a website is the classic example: using a password, which entails the "application of information," enables a user to gain access to the work on the website. *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 531 (S.D.N.Y. 2004).

Plaintiffs cannot fit the rolling cipher into that mold because there is no key—that is, no information, process, or treatment—that users apply to permit access. Per Plaintiffs, any user with a web browser and internet connection can access their works via YouTube. Compl. ¶¶ 2, 8. They identify nothing users need to apply to the rolling cipher to access YouTube videos. If the average home user goes to YouTube and searches for the work, they will find it, and they can view it, without any key—rolling cipher, or not. Whatever the rolling cipher does, it does not block *access* to Plaintiffs' works.

*(2) IP Blocking and Rate Limiting.* Plaintiffs next allege that "YouTube's infrastructure monitors the number and frequency of requests originating from individual IP addresses against defined thresholds. *Once those thresholds are exceeded*, YouTube's servers cut off platform access from the offending IP address entirely, preventing any further retrieval of audiovisual content from that source." Compl. ¶ 48 (emphasis added). Plaintiffs do not allege that this measure is employed each time before a YouTube video is streamed; it is only deployed against certain IP addresses, and even then, only after they exhibit "abnormal request volume" consistent with downloading. *Id*. ¶ 47. It prevents those IP addresses from further "retriev[ing] any content from YouTube's servers." *Id*; *see also id*. ¶ 48.

This is again a copy control in disguise, geared at stopping *downloads*: YouTube "blocks IP addresses that make too many *download attempts* in a specified period." Compl. ¶ 30 (emphasis added). Users subject to IP blocking and rate limiting can gain access to the work without any information, process, or treatment, which confirms that these measures do not constitute access controls under § 1201. As Plaintiffs allege, IP-blocking only applies to prevent "further" retrieval of content once an IP address has made too many requests, making evident that the user *already* had access to the work. *See* Compl. ¶¶ 47-48 (explaining that the TPM is

applied "when excessive or abusive request patterns are detected" and when it "detects abnormal request volume originating from a particular IP address"). Additionally, this supposed TPM would be ineffective if a user chose simply to switch IP addresses—for example, by switching their desktop computer from one WiFi network to another. One's ability to access a YouTube video from the same device even when IP blocking is employed underscores that this measure is not an access control because access to YouTube is available through another means— essentially through any other IP address. *See, e.g.*, *MDY*, 629 F.3d at 953 (no access control where there is any "ability to access" the work). Again, it is clear that the only thing that these measures are intended to prevent is *copying*.

The measure falls short for another independent reason: Section 1201(a) "requires" the copyright holder to both put up a lock—the "technological measure" which "effectively controls access to a work"—*and* hold the key— "the application of information, or a process or treatment" to open the lock "with the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(B). Even if blocking and rate limiting function as a lock (and they do not), there is no key in sight: A "blocked IP address cannot stream, browse, or retrieve any content from YouTube's servers" and Plaintiffs allege no information, process, or treatment could change that. Compl. ¶ 47. In other words, there is no digital key that would permit access, pushing this TPM even further outside the statutory scope.

*(3) Short-Lived Links.* YouTube's alleged "session-bound, short-lived URLs" are not access controls for similar reasons. Compl. at 11. Plaintiffs allege that YouTube issues "temporary" URLs that are "tied to a particular playback session," such that "a previously valid link does not provide continuing access to the file." *Id*. ¶ 50. An "automated system" must

- 26 -

(according to Plaintiffs) therefore "repeatedly obtain fresh authorization parameters and regenerate valid media URLs" to continue to use the file. *Id*. ¶ 51.

Again, nothing in these allegations pleads a work is *inaccessible* because the video links are short lived. As Plaintiffs concede, these are "streaming URLs," Compl. ¶ 39—whatever complications they pose for downloading, Plaintiffs do not suggest they pose any barrier to *access*. To the contrary, while the link is "live," Plaintiffs concede the work is accessible: Only "*[o]nce the authorization window expires or the session ends*" will "the server … refuse to deliver the audiovisual file in response to that URL." *Id*. ¶ 50 (emphasis added).

Like IP blocking, short-lived links fall short in a related but independent way: Nothing about Plaintiffs' allegations suggests that, once a URL expires, Plaintiffs can hand out a key— any information, application, or process—to grant access notwithstanding expiration. *See* Compl. ¶ 51 (alleging that the "session-bound URLs expire automatically"). Again, this measure consists of a lock without a key, and thus does not meet the statutory definition of a technical measure.

*(4) CAPTCHA Challenges.* The fourth TPM that Plaintiffs allege are CAPTCHA challenges, which are "tests designed to separate human users from bots, often requiring identification of objects in grainy images." Compl. ¶ 52. For a technical measure to effectively control access to a work, it must be employed each time before one can gain access to a work. *See* 17 U.S.C. § 1201(a)(3)(B); *see also, e.g.*, *Reimerdes*, 111 F. Supp. 2d at 317-18 (finding that CSS encryption effectively controls access where "[o]ne cannot gain access to a CSS-protected work on a DVD *without application of the three keys* that are required by the software" (emphasis added)). But Plaintiffs allege a measure that is only applied *some* of the time, when certain triggering or predicate acts occur. According to the Complaint, YouTube only issues CAPTCHA challenges "[w]hen traffic patterns indicate automated or suspicious activity,"

Compl. ¶ 52—not as a matter of course. *See id.* (measure triggered by "automated" activity); *see also id.* ¶ 5 (asserting "Defendant used automated video-downloading programs"). Needing to complete a CAPTCHA challenge before streaming a video is the exception, not the norm. Because works can regularly be accessed without ever encountering a CAPTCHA, CAPTCHA challenges cannot constitute an access control used by YouTube. *See MDY*, 629 F.3d at 953.[8] Again, this is a copy control and does not alter the fact that YouTube videos are publicly accessible by default.

(5) *Proof-of-Origin Tokens.* Plaintiffs' final purported technological protection measure is proof-of-origin tokens, which "are generated dynamically by YouTube's official player software during an active, authenticated playback session"—i.e., when a video is streamed on YouTube. Compl. ¶ 56. Plaintiffs allege that YouTube requires that "all requests for video segments include cryptographic proof-of-origin tokens that validate the request as originating from an authorized YouTube playback environment." *Id.* Plaintiffs do not allege that a YouTube user must apply any sort of information, process, or treatment (like entering a password) for YouTube to issue a token and stream a video. After all, Plaintiffs concede that YouTube videos are freely available to any member of the public with an internet browser. *Id.* ¶¶ 2, 8; *supra* 16-17.

---

[8] Although one case determined CAPTCHA challenges were technological measures under § 1201(a), the facts were different: completion of the CAPTCHA challenge was *always* required in order to access a work. *See Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) ("The user is *required* to type the characters into an entry on the screen in order to proceed with the request.") (emphasis added). Here, according to Plaintiffs' allegations, YouTube's deployment of CAPTCHA challenges was the exception rather than the rule. Plaintiffs do not allege that YouTube users *must* complete a CAPTCHA challenge as a matter of course *each time* before watching a video on YouTube.

Even if proof-of-origin tokens controlled access, Plaintiffs cannot plead that Runway "circumvented" them. Compl. ¶¶ 56-59. Congress stipulated that to "circumvent a technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner[.]" 17 U.S.C. § 1201(a)(3)(A). In other words, "a person circumvents a technological measure only when he *affirmatively performs an action* that disables or voids the measure that was installed to prevent them from accessing the copyrighted material." *Dish Network LLC v. World Cable Inc.*, 893 F. Supp. 2d 452, 466 (E.D.N.Y. 2012) (quoting *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 644 (E.D. Pa. 2007) (emphasis in original)). On the other hand, courts agree that using valid credentials to access a work, even if one did not have permission to use those credentials, is not circumvention because the access is ultimately not "unauthorized." *Dish Network*, 893 F. Supp. 2d at 465-66 (collecting cases).

Plaintiffs' allegations regarding the proof of origin tokens fail for this reason: Their allegations state no more than re-use of valid credentials. Indeed, Plaintiffs allege that Runway "circumvented TPM No. 5 by extracting, replicating, or reusing proof-of-origin token parameters" to obtain "files that YouTube's token system was designed to deliver only to approved clients." Compl. ¶ 108. Because Plaintiffs allege that Runway used *valid* tokens—albeit reused or replicated—to access the works, and using valid tokens is "the normal process or the intended mechanism for obtaining the copyrighted work," Plaintiffs have not stated a claim for circumvention. *I.M.S.*, 307 F. Supp. 2d at 532-33 (the defendant's use of a password issued by the plaintiff to another entity was not circumvention under section 1201(a)(1) because it "did not surmount or puncture or evade any technological measure"); *Dish Network*, 893 F. Supp. 2d

- 29 -

at 466 (finding that the defendants' use of the "normal process to decrypt the satellite signal did not avoid or bypass the conditional access system because they used the intended mechanism[s] … in precisely the manner in which they were designed to function," regardless of allegations that the defendants gained access to the mechanisms "through fraud and deceit").

\* \* \*

Plaintiffs' focus on copy controls corresponds perfectly with their real concern: "infringement of Plaintiffs' and Class Members' video content." Compl. ¶ 16. Perhaps they do not have a viable infringement claim because they chose not to register their works, a statutory prerequisite to an infringement suit. *See id*. ¶ 13; 17 U.S.C. § 411(a). Or they may not wish to defend against fair use amid an emerging consensus that innovative uses like Runway's are transformative and fair. *See Bartz*, 787 F. Supp. 3d at 1033; *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1059-60 (N.D. Cal. 2025). But that does not license Plaintiffs to use inapposite sections of the DMCA as an alternative to infringement.

## III.    Plaintiffs Have Not Adequately Alleged Authority Over Any TPMs.

Finally, Plaintiffs' claim fails for the related reason that any alleged access control is *YouTube's* control—not Plaintiffs'. An effective access control is a measure that, "*in the ordinary course of its operation*, requires the application of information, or a process or a treatment, with the *authority of the copyright owner*[] to gain access to the work." 17 U.S.C. § 1201(a)(3)(B) (emphases added). It is, in other words, a "measure which requires the use of a 'key' provided by a copyright owner to gain access to a work." H.R. Rep. No. 105-551, pt. 2 at 39. As the plain text of the statute contemplates, the copyright owner must be able to delegate "authority" in "ordinary" course to open or close the gates to the work. *Contra* Compl. ¶ 143. After all, Congress passed § 1201 to reinforce the efforts of a "copyright owner [who] has put in place a technological measure that effectively controls access to his or her work." H.R. Rep. No.

- 30 -

105-551, pt. 1, at 17; *see Corley*, 273 F.3d at 435 (describing § 1201 as the legal sanction Congress provided to support "the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections").

Plaintiffs have not pled the statutorily required authority over the purported technological measures. Plaintiffs do not try to allege that *they* made any effort to "put in place" the technological measures at issue. *See* Compl. ¶ 140 ("*YouTube* employs TPMs that effectively control access to Plaintiffs' and Class Members' Videos" (emphasis added)). And Plaintiffs concede that YouTube implemented, and maintains, those measures in the ordinary course of operation; at no point do they suggest they have any power to intervene in YouTube's application of any measures to particular works. *E.g.*, *id*. ¶ 7 (describing "YouTube's access controls").

Plaintiffs summarily allege that "content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software" and Terms of Service. Compl. ¶¶ 9, 144. But they make no effort to grapple with the plain, and contrary, language of the Terms themselves: "YouTube is under no obligation to … serve Content" and "[u]sing the Service does not give you ownership of or rights to any aspect of the Service," anti-circumvention measures included. TOS at 4, 7. YouTube also offers all measures "as is" and "does not make any specific commitments or warranties" about those measures or their effectiveness. *Id.* at 12. And if those measures fail, YouTube "will not be responsible" for "any unauthorized access to or use" or "any loss" that results, *id.* at 13, undercutting any inference that Plaintiffs had control over (or even reasonably relied on) YouTube's measures.

Given that YouTube can turn off all alleged measures at any time without Plaintiffs'

- 31 -

permission—or even consulting them—Plaintiffs cannot meet the "authority of the copyright owner" element of the statutory definition of "technological measure." 17 U.S.C. § 1201(a)(3)(B). Plaintiffs made no investment or effort in anti-circumvention technology for Congress to protect with the anti-circumvention provision. Allowing Plaintiffs to nonetheless sue as if the measures were their own or under their authority thus does not "gut the statute's protections," Compl. ¶ 145—it avoids a rule under which any of YouTube's billion-plus users (or any other platform's untold users) can enforce an absent, private intermediary's terms of service through the federal instrument of the DMCA. There is no reason to think Congress contemplated such an expansive theory of liability.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated: May 27, 2026

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Nathan Shaffer*

ORRICK, HERRINGTON & SUTCLIFFE

Annette L. Hurst (*pro hac vice*)
Nathan Shaffer (*pro hac vice*)
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone: (415) 773-5700
ahurst@orrick.com
nshaffer@orrick.com

Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
mshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Attorneys for Defendant
RUNWAY AI, INC.